# In the United States Court of Federal Claims

No. 22-1736 C
(Filed: March 28, 2024)

```
* * * * * * * * * * * * * * * **  *
                                   *
IRWIN COUNTY, GEORGIA,             *
LASALLE SOUTHEAST, LLC,            *
                                   *
                Plaintiffs,        *
                                   *
        v.                         *
                                   *
THE UNITED STATES,                 *
                                   *
                Defendant.         *
                                   *
    * * * * * * * * * * * * * * * *  *
```

*Deirdre McGlinchey*, with whom were *Daniel T. Plunkett*, *G. Dewey Hembree, III*, and *John T. Rouse*, McGlinchey Stafford PLLC, for Plaintiff.

*Stephen M. Mager*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Natalie Allenbaugh*, Trial Attorney, *Eric P. Bruskin*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant.

## OPINION AND ORDER

**SOMERS**, Judge.

The small, rural Georgia county of Irwin is known for its strong Unionist history, pleasant farmland, and, more recently, false reports of forced hysterectomies in its county prisons. *See, e.g.*, Caitlin Dickerson et al., *Immigrants Say They Were Pressured Into Surgeries*, N.Y. TIMES (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html. Although both Plaintiffs and the government agree that these reports of forced hysterectomies are false, Plaintiffs contend that the Department of Homeland Security ("DHS") terminated its contract to house Immigrations and Customs Enforcement ("ICE") detainees in bad faith based on these false reports. They argue also that the contracting officer who supervised the contract's administration abused his discretion because he failed to make an independent judgment regarding contract termination. As the Court finds that Plaintiffs' complaint does not state a plausible claim based on either count and that Plaintiff LaSalle Southeast LLC ("LaSalle") does not have standing to bring a breach of contract claim against the United States, the Court grants the government's motion to dismiss under Rules 12(b)(1) and (6) of the Rules of the United States Court of Federal Claims ("RCFC").

1

## BACKGROUND

### A.    Factual History

This case began when DHS terminated a contract to house ICE detainees in Irwin County, Georgia.  Irwin County and DHS executed an intergovernmental services agreement ("the contract") on June 15, 2020.  ECF No. 15 ¶ 6 ("Am. Compl.").  The contract provided "the provision of the necessary physical structure, equipment, facilities, personnel, and services to provide a program of care in a properly staffed and secure environment" for a "minimum population of at least 600 [ICE] detainees."  ECF No. 15-1 at 15.  It specified that Irwin County had to hold the detainees at Irwin County Detention Center, though it also contained a provision stating that the county could "notify and obtain approval from the ICE Contracting Officer if it intend[ed] to house ICE detainees in a facility other than the Irwin County Detention Center." *Id.* at 16.  The contract stated that it was effective "for a period not to exceed 60 months unless extended by bi-lateral modification or terminated in writing by either party."[1]  *Id.* at 28.  Article 8 of the contract, titled "Period of Performance," stated also that "[e]ither party must provide written notice of intention to terminate the agreement, 120 days in advance of the effective date of formal termination, or the Parties may agree to a shorter period under the procedures prescribed in Article 11.  If this Agreement is terminated by either party under this Article, ICE will be under no financial obligation for any costs after the date of termination."  *Id.*

LaSalle had a contractual relationship with Irwin County at the time the county entered into its agreement with DHS.  LaSalle and Irwin County's existing contract authorized LaSalle "to manage, operate, and maintain the Irwin County Detention Center."  Am. Compl. ¶ 7.  As it controlled day-to-day prison operations, LaSalle often interacted and communicated with the government regarding the ICE detention specified in the contract with Irwin County.  *Id.* ¶¶ 7, 15.  The government does not contest that, given the pre-existing contractual relationship between LaSalle and Irwin County, LaSalle was a known incidental beneficiary of Irwin County's contract.  ECF No. 27 at 14.  However, the contract between DHS and Irwin County did not mention LaSalle and stated that DHS "w[ould] not accept invoices from, or make payments to, a subcontractor."  ECF No. 15-1 at 16.

Initial operations proceeded smoothly.  The Irwin County Detention Center housed at least 600 detainees each month after June 2020.  Am. Compl. ¶ 14.  LaSalle even entered negotiations with DHS in September 2020 to construct a new modular building for ICE administrative offices at the detention center.  *Id.* ¶ 15.  LaSalle obtained a near-million dollar estimate for the building, but these plans never moved forward.  *Id.* ¶ 16.

Trouble began in September 2020.  According to Plaintiffs, "immigration activist groups and attorneys" filed a complaint with DHS's Office of Inspector General ("OIG"), which alleged that "an off-site obstetrician and gynecologist . . .  performed 'high rates' of unauthorized hysterectomies on ICDC detainees."  *Id.* ¶ 20.  The OIG complaint included a nurse's testimony

---

[1] Plaintiffs state misleadingly in their amended complaint that "[t]he IGSA had a term of 60 months," ECF No. 15 ¶ 12, though the contract itself stated only that 60 months was the maximum performance length.  *See* ECF No 15-1 at 28.

that the off-site doctor was a "uterus collector," and that for "[e]verybody he sees, he's taking all their uteruses out or he's taken their tubes out."  ECF No. 21-1 at 21.

Both the government and Plaintiffs agree that these reports were false.  DHS investigated the allegations contemporaneously and found them "clearly false." Am. Compl. ¶ 23.  Plaintiffs note that LaSalle's internal investigation found no wrongdoing, *id.* ¶ 24, and the government admits that the "U.S. Senate[] Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations did not substantiate allegations of mass hysterectomies," ECF No. 21 at 8 n. 5.  As the Plaintiffs' complaint illustrates in its exhibits, however, the story was reported widely in the media.  *See, e.g.,* ECF No. 15-10.

DHS advised Irwin County of its intent to terminate the contract on May 20, 2021.  Am. Compl. ¶ 28.  The notice of intent to terminate stated that the agreement would end on September 17, 2021, unless the parties agreed to a shorter operational period, but did not state a reason for the termination.  ECF No. 15-3.  In a subsequent press release announcing the termination, Secretary of Homeland Security Alejandro Mayorkas stated that he would "not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention" and that the Irwin County Detention Center failed to meet "safety and health standards."  ECF No. 15-9 at 2.  He instructed the department to "discontinue the use of the Irwin County Detention Center in Ocilla, Georgia as soon as possible and consistent with any legal obligations." *Id.*  The same press release also announced the cancellation of another contract with a detention center in Massachusetts. *Id.*

Plaintiffs and the government disagree on the import and meaning of Secretary Mayorkas' statements.  Plaintiffs construe the explanation of the termination as an admission that the government terminated the contract with Irwin County because of the allegations of forced hysterectomies, which it states firmly are false.  Am. Compl. ¶¶ 27, 28, 38, 39, 44.  Plaintiffs cite several sources, including a January 2022 report from the Department's OIG that found that the Irwin County Detention Center "generally met U.S. Immigration and Customs Enforcement (ICE) detention standards" and "adhered to . . . appropriate and necessary medical, dental, and mental health care [standards]" to support its claim. *Id.* ¶ 43 (quoting ECF No. 15-6 at 111).  It also notes that "[a]t no time has the Government found or notified the County of support for the Allegations or any violations of the Department's health and safety standards at the ICDC."  Am. Compl. ¶ 39.  Plaintiffs complain that these facts indicate that the termination "was arbitrary and capricious, constituted an abuse of discretion, and was done in bad faith." *Id.* ¶ 52.

The government denies that the allegations of hysterectomies animated the decision to terminate the contract.  It notes that the press release announcing the termination "makes no specific refence to these allegations" and that the allegations of false hysterectomies were "but one of several serious concerns raised to DHS about the Irwin County Detention Center."  ECF No. 21 at 6–7.  It points, for example, to the fact that "between fiscal years 2017 and 2020, the OIG report hotline received 795 complaints regarding Irwin County." *Id.* at 7 (citing ECF No. 15-11 at 7).  Regardless of the reasons, DHS terminated the agreement on October 7, 2021.  Am. Compl. ¶ 31.

**B.      Procedural History**

Plaintiffs challenged the contract's termination with a request for a final decision from the contracting officer on September 29, 2021.  ECF No. 15-4 at 2.  They demanded a sum certain of $66,981,000, which they calculated by "multiplying the 1,345 days remaining on the Contract by the minimum guarantee of 600 detainees house per day at $83."  *Id.*  This sum included "all monies owed to [LaSalle], the entity which Irwin County subcontracted to house and transport ICE detainees."  *Id.*  Plaintiffs noted that the sum excluded "LaSalle's internal and external legal costs [and] reputational damages Irwin County and LaSalle have suffered as a result of DHS Secretary Mayorkas's libelous comments about the staff and conditions at the Irwin County Detention Center."  *Id.* at 3.  It also omitted the "strong legal argument . . . that DHS's decision was not a termination for convenience" authorized by a contractual clause, but rather a "hasty, political, and ill-conceived effort to appease an anti-detainee constituency in the midst of a detainee housing crisis" upon which it believed it had a strong claim for breach of contract.  *Id.*

The contracting officer denied the claim on November 24, 2021.  Am. Compl. ¶ 33; ECF No. 15-5.  Plaintiffs challenged the termination again with the contracting officer on August 1, 2022, and asked this time for only $16,002,917.  Am. Compl. ¶ 34; ECF No. 15-6 at 7.  This challenge made more explicit the Plaintiffs' contention that the government's termination breached the terms of the contract and asked for $7,304,723 if its bad faith claims did not succeed.  ECF No. 15-6 at 7.  The contracting officer rejected the second claim on October 5, 2022, and stated that both challenges were "based on common operative facts, . . . substantially the same claim" and, therefore, were properly addressed in the initial denial decision.  ECF No. 15-7.

Plaintiffs filed their initial complaint in this Court on November 23, 2022.  ECF No. 1.  They amended their amended complaint to remove one of Irwin County's subcontractors with the Court's leave on June 7, 2023.  ECF No. 15.  After several granted motions for extensions of time to respond to the amended complaint, the government failed to obey this Court's directive to respond to Plaintiffs' complaint on or before June 21, 2023.  ECF No. 17.  The Court thus instructed the Clerk to enter a default against the United States, which the Court vacated only after the government showed good cause that the default should be lifted.  ECF Nos. 19, 20.  The government moved to dismiss the amended complaint on June 28, 2023, based on RCFC 12(b)(1) for lack of subject matter jurisdiction over LaSalle's claims, as well as under RCFC 12(b)(6) for failure to state a claim as to the complaint's bad faith and abuse of discretion claims.[2]  ECF No. 21.

---

[2] The government also sought summary judgment as an alternative to dismissal under RCFC 12.  ECF No. 21.  As the amended complaint must be dismissed under Rule 12, the Court does not address the government's summary judgment arguments.

## DISCUSSION

**A.      Legal Standard**

The United States Court of Federal Claims, like all federal courts, is a court of limited jurisdiction.  In their complaint, Plaintiffs assert two bases for this Court's jurisdiction over their claims: the Tucker Act and the Contract Disputes Act ("CDA").  Under the Tucker Act, this Court may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  To state a claim within the Court's Tucker Act jurisdiction, however, "the plaintiff must identify a separate contract, regulation, statute, or constitutional provision that provides for money damages against the United States."  *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013).  Put differently, the plaintiff must state a claim based on a provision that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained," *United States v. Mitchell*, 463 U.S. 206, 217 (1983) (citing *United States v. Testan*, 424 U.S. 392, 400 (1976)), and is "reasonably amenable to the reading that it mandates a right of recovery in damages."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003).

Under the CDA, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor . . . including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued."  28 U.S.C. § 1491(a)(2).  To assert jurisdiction under the CDA, "all claims by a contractor against the government relating to a CDA-covered contract must be in writing and submitted to the contracting officer for a decision."  *Textron Aviation Def. LLC v. United States*, 161 Fed. Cl. 256, 264 (2022) (citing 41 U.S.C. § 7103(a)).  In addition, the contractor must have received a final decision from the contracting officer before proceeding to this Court.  *Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1247 (Fed. Cir. 2016) ("[Although] a contractor has the option of appealing a contracting officer's decision on a CDA claim either to the appropriate board of contract appeals or [this Court] . . .[,] only final contracting officer decisions may be appealed.").  These requirements are jurisdictional.  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010); *accord ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364, 1371 (Fed. Cir. 2023) (stating that only requirements contained "in the CDA itself" are jurisdictional).

Even if a plaintiff asserts a claim within the Court's jurisdiction, he or she must still present a claim upon which the Court can grant relief.  "When considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court accepts all well-pled facts as true and draws all reasonable inferences in plaintiff's favor."  *Silver Buckle Mines, Inc. v. United States*, 117 Fed. Cl. 786, 791 (2014) (citations omitted).  Granting a motion to dismiss for failure to state a claim "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  Exhibits attached to a complaint are considered part of the complaint for the purposes of a motion to dismiss, and the Court "must consider the complaint in its entirety, . . . in

particular, documents incorporated into the complaint by reference" in ruling on a motion to dismiss. *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (internal citations omitted); *see also* RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").

Plausibility is the touchstone of any motion to dismiss for failure to state a claim. Denial of the motion is warranted if the complaint presents "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Bare allegations are not sufficient to meet this standard; the Court must evaluate the facts that support the allegations, "consider[] the range of possible interpretations of the defendant's alleged conduct, [and] if the 'more likely explanations' involve lawful, non-actionable behavior, . . . should find that the plaintiff's claim is not plausible." *Todd Constr., L.P. v. United States*, 94 Fed. Cl. 100, 115 (2010) (quoting *Twombly*, 550 U.S. at 1950–51). For these purposes, "allegations that are 'merely consistent with' [a claim] are insufficient," and "[w]here . . . the factual allegations are actually inconsistent with and contradict [the claim], they are likewise insufficient to state a plausible claim." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1354 (Fed. Cir. 2021) (quoting *Twombly*, 550 U.S. at 557).

## B.  Analysis

The government has moved to dismiss the claims brought by LaSalle for lack of subject matter jurisdiction and the claims brought by Irwin County (and LaSalle to the extent that the Court has jurisdiction over LaSalle's claims) for failure to state a claim upon which relief can be granted. For the following reasons, the government's motion to dismiss is granted upon both grounds.

### 1.  LaSalle Failed to Meet Its Burden to Prove that It has Standing

In general, the "government consents to be sued only by those with whom it has privity of contract"; therefore, "[i]t is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act . . . or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978." *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). Although LaSalle concedes that it is not in privity of contract with the United States, *see* Am. Compl. ¶ 8, it nonetheless seeks to avail itself of this Court's jurisdiction by claiming that it is a third-party beneficiary of Irwin County's contract with the United States or, alternatively, that it asserts pass-through claims against the United States based on the county's contract, *see* ECF No. 24 at 7. LaSalle's assertions, however, fail to meet its burden. First, LaSalle has not established that it is a third-party beneficiary of Irwin County's contract. Second, although so-called pass-through claims are within this Court's jurisdiction, such claims allow a *prime contractor* to bring, or sponsor, a subcontractor's claims *in the prime contractor's name* against the United States because of the prime contractor's privity of contract with the government. Thus, a pass-through

claim does nothing to aid LaSalle's quest for standing to bring suit in this Court. Accordingly, as is explained below, the government's motion to dismiss LaSalle for lack of standing is granted.[3]

### a. LaSalle has not Demonstrated that it is an Intended Third-Party Beneficiary of Irwin County's Contract with the United States

Plaintiffs contend that LaSalle has standing to bring suit against the United States as an intended third-party beneficiary of the contract between Irwin County and DHS because of LaSalle's work as subcontractor at the Irwin County Detention Center. The allegations in the amended complaint regarding LaSalle's third-party beneficiary status are bare conclusions unsupported by facts. Plaintiffs do not improve upon these conclusory statements in their response to the government's motion to dismiss. Rather, in their response brief, Plaintiffs show only that DHS was aware that it would work primarily with LaSalle at the Irwin County Detention Center when it signed the contract with Irwin County. Neither the bare assertion of third-party beneficiary status nor DHS's awareness of the fact that LaSalle was a subcontractor (even a very major subcontractor) on Irwin's contract are sufficient to establish intended third-party beneficiary status.

Consistent with the general rule that parties must be in privity of contract with the government to bring suit against the government, "the requirements to demonstrate third-party beneficiary status are 'stringent.'" *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (quoting *Anderson v. United States*, 344 F.3d 1343, 1352 (Fed. Cir. 2003)). The Federal Circuit has stated that "to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001). Under this broader rule, a "subcontractor is a third party beneficiary to the government contract when the [contracting officer] knew or should have known that the government's payment on the contract was intended to directly benefit the subcontractor." *J.G.B. Enterprises, Inc. v. United States*, 497 F.3d 1259, 1261 n. 1 (Fed. Cir. 2007). Contracts

---

[3] LaSalle states in response to the government's motion to dismiss that if "the Court finds that LaSalle has not adequately pleaded its claims at this stage, LaSalle respectfully [be given] an opportunity to amend its pleadings accordingly." ECF No. 24 at 18. LaSalle's request is denied. First, LaSalle was given an opportunity to amend its pleadings if it did not believe it had adequately pled jurisdiction—the Rules specifically provide that a party "may amend its pleadings once as a matter of course within . . . 21 days after service of a motion under RCFC 12(b) . . . ." RCFC 15(a)(1)(A). The Court is not quite sure how LaSalle would amend its pleadings to create a third-party benefit relationship where none exists, but, if LaSalle is aware of such facts, the time to amend its pleadings was within 21 days of the government's motion to dismiss rather than at some future date after the government had expended time replying to LaSalle's response and after the Court prepared for and held oral argument in this matter. Pleading is not a shell game in which a plaintiff waits around to see what the government raises regarding jurisdiction, gets to gauge the Court's reaction to the government's jurisdictional arguments at oral argument, and must only then reveal new allegations in support of jurisdiction. Plaintiffs bear the burden of proof on jurisdiction, and RCFC 15 provides the means to correct or add allegations in support of jurisdiction if necessary. Second, any amendment of the pleadings would be futile because the complaint makes clear that LaSalle's claims are encompassed within Irwin County's claims, which the Court, as explained below, dismisses for failure to state claim. *See, e.g.*, *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016) ("A proposed amendment is futile if it would not survive a motion to dismiss.").

that designate subcontractors as intended third-party beneficiaries typically "involve a payment mechanism by which the subcontractor has direct access to payments made by the government." *Constructora Guzman, S.A. v. United States*, 161 Fed. Cl. 686, 694 (2022). Courts "will not . . . infer that the government intended to directly benefit the subcontractor merely because an authorized government official (1) oversees the activities of the prime contractor; (2) becomes aware that the prime contractor has failed to timely pay its subcontractors, and/or (3) makes funds available to the prime contractor in order for the prime contractor to pay its subcontractors." *G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 673 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015).

Plaintiffs do not come anywhere close to proving an express intent to directly benefit LaSalle in their amended complaint (nor did they in their original complaint). Indeed, they mention third-party beneficiary status in only twice in the amended complaint. First, they state that "LaSalle was a subcontractor and third-party beneficiary under the IGSA." Am. Compl. ¶ 8. Second, they also state in passing that "LaSalle Southeast, LLC asserts claims as a third-party beneficiary of the Inter-Governmental Services Agreement." Am. Compl. ¶ 1; *see also* ECF No. 1 ¶ 1 (original complaint stating the same). First, the Court does not need to accept as true the bare legal conclusion that LaSalle is a third-party beneficiary of the contract for the purposes of this motion to dismiss. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Second, the mere fact that LaSalle was a subcontractor does not make it an intended third-party beneficiary of the contract. Government contracts regularly permit contractors to hire subcontractors to assist in meeting the contract's requirements. Moreover, the government regularly knows who those subcontractors are and what the subcontractors' responsibilities are under the contract, and, in many cases, both approves the subcontractors and takes their experience and capabilities into account in awarding the prime contract. But none of this, without more, makes a subcontractor an intended third-party beneficiary of a contract. Rather, "[t]he contract must reflect the express or implied intention of the parties to benefit the third party." *Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304, 1309 (Fed. Cir. 2000) (internal quotations omitted).

Furthermore, the contract itself, which Plaintiffs include as an exhibit to their amended complaint and is therefore part of the complaint for the purposes of the motion to dismiss, also provides no indication that the parties intended to benefit LaSalle directly. First, the contract does not mention LaSalle by name. *See generally* ECF No. 15-1. Second, although it contemplates the existence of any number of subcontractors, it also provides that "ICE will not accept invoices from, or make payments to, a subcontractor." *Id.* at 16. Without explicit recognition in the contract or direct access to payments by the government, LaSalle cannot claim intended third-party beneficiary status based on some form of direct payment to it. *Constructora Guzman, S.A.*, 161 Fed. Cl. at 694; *G4S Tech. LLC*, 114 Fed. Cl. at 673. Third, the contract gave DHS and Irwin County the ability to house the detainees at a facility other than Irwin County Detention Center upon agreement. *See* ECF No. 15-1 at 16. If DHS and Irwin County had so agreed, LaSalle would no longer have benefitted whatsoever from the contract between Irwin County and DHS. LaSalle's alleged third-party beneficiary status, therefore, was based purely on the fact that it was the subcontractor running the prison that the parties in privity chose to hold

the detainees.  Had Irwin County and DHS changed their minds as to the location, LaSalle would not have any rights or opportunities to benefit further under the contract.

Moreover, Plaintiffs' other arguments on this point are both missing from the amended complaint and are nonetheless unpersuasive because they also do not establish an intent to benefit LaSalle specifically and directly.  The government "do[es] not contest that LaSalle was a known incidental beneficiary of the agreement."  ECF No. 27 at 14.  As LaSalle notes and the government agrees, the contract listed LaSalle's Chief Financial Officer as a point of contact along with a representative from Irwin County.  ECF No. 15-1 at 4.  In other words, DHS evidently understood that it would likely work with LaSalle because LaSalle managed the day-to-day operations of the prison and, according to LaSalle, sent and received several invoices to and from LaSalle.[4]  ECF No. 24 at 11.  But these and other indicia Plaintiffs point to in response to the government's motion to dismiss do not establish a clear intent to benefit LaSalle specifically as an intended third-party beneficiary.  Isolated government payments and even ongoing communications do not express government intent to benefit LaSalle specifically when there are sections of the contract that state explicitly that the agency "will not accept invoices from, or make payments to, a subcontractor."  ECF No. 15-1 at 16.  If DHS sent invoices to or paid LaSalle directly, it did so only because of LaSalle's incidental work at the prison rather than because DHS intended LaSalle specifically to benefit from the contract between DHS and Irwin County.[5]

Finally, if the above extra-complaint arguments were not insufficient enough, Plaintiffs make the even more audacious argument in their response that "ICE utilized the [contract] with Irwin County to establish a contractual relationship with LaSalle in order to circumvent costs and limitations that would have been imposed if ICE had directly contracted with LaSalle."  ECF No. 24 at 7.  In this sense, according to Plaintiffs, "LaSalle is a third-party beneficiary to the IGSA because ICE knew and understood that LaSalle stood in the shoes of Irwin County and evidenced an intent to pay LaSalle for its performance of the IGSA, and merely utilized Irwin County as the 'middleman' in order to disguise payments to LaSalle."  *Id.*  Plaintiffs support their claims with a

---

[4] Though LaSalle claims this is the case, they have not produced any record of the invoices either sent by the government and received by LaSalle or sent by LaSalle and received by the government.  *See* ECF No. 24 at 11 (stating that "LaSalle sent invoices directly to ICE, billing both for fees due for the housing and care of detainees as well as transportation of detainees.  Those invoices included a Tax ID number that belongs to LaSalle Southeast, LLC and referenced the applicable IGSA number.  Moreover, bank statements demonstrate that CGL/Lasalle Irwin Properties, LLC ("CGL/LaSalle"), identified in the Operation Agreement as the owner of the ICDC [Doc. 15-2] and an entity related to LaSalle Southeast, LLC, received payments wired directly to that entity from ICE," but citing no documents in the record for that proposition).  As the Court must take all alleged facts as true for the purposes of a motion to dismiss, the Court assumes that these bank statements and invoices exist.

[5] LaSalle also highlights the fact that the government sent the warden of the Irwin County Detention Center, a LaSalle employee, the notice of termination before it sent the letter to Irwin County itself.  ECF No. 24 at 13.  Indeed, according to LaSalle "when ICE realized that it should issue a copy of the Notice of Intent to Terminate to Irwin County, the contracting officer did not even know the identity of Irwin County's point of contact and had to obtain that information from LaSalle."  *Id.* at 14.  This observation says nothing about contractual intent to benefit LaSalle specifically.  It reflects no more than the practical reality that the contracting officer dealt more with LaSalle because of their day-to-day management of the prison.

DHS Advisory Council report that noted that ICE often interfaced primarily with private contractors when it entered prison contracts with state and local governments, as well as a DHS OIG report that found in a particular case that ICE signed a contract with a county to avoid federal regulations regarding ICE contracts with private companies. *Id.* at 9–10.  Plaintiffs argue that the same was true for this contract because, contrary to the contract's statement that DHS would not accept invoices from or make payments to a subcontractor, "ICE did, in fact, accept invoices from LaSalle and did, in fact, issue payments directly to LaSalle." *Id.* at 11.  They argue also that DHS knew that LaSalle would be the subcontractor running the Irwin County Detention Center during the term of the contract and that LaSalle had to approve all detention contracts for Irwin County using the correctional center. *Id.* at 12–13.  Plaintiffs contend that all the circumstances surrounding the contract formation between Irwin County and DHS entitle LaSalle to intended third-party beneficiary status.

These arguments prove far too much.  If the government used its contract with Irwin County to bypass various federal regulations and statutes regarding ICE's ability to contract with a private party like LaSalle, the resulting contract would almost certainly be illegal. *See* 8 U.S.C. § 1103(a)(11)(B) (authorizing DHS to make detention contracts with only "any State, territory, or political subdivision thereof").  The February 21, 2018, DHS OIG report that Plaintiffs cite in support of their argument reached exactly this conclusion. *See* ECF No. 24-1 at 145.  If DHS acted illegally in making the contract with Irwin County, any rights under the contract would be consequently invalid. *Godley v. United States*, 5 F.3d 1473, 1475 (Fed. Cir. 1993) ("In general, a Government contract tainted by fraud or wrong-doing is void *ab initio*.").  Therefore, any claims that LaSalle could assert as an intended third-party beneficiary of the contract between Irwin County and DHS, which was by Plaintiffs' argument void *ab initio*, would also be invalid.  This case need not proceed to discovery to confirm facts which, if true as alleged, would invalidate the contract that is the basis of those claims.

In sum, Plaintiffs' complaint does not allege facts sufficient to support their claim that LaSalle was an intended third-party beneficiary of the contract and Plaintiffs' arguments in response to the government's motion to dismiss are unpersuasive on this point.  LaSalle, therefore, is not entitled to assert its claims as an intended third-party beneficiary of Irwin County's contract with DHS.

### b. A Pass-Through Claim does not Support LaSalle's Standing

Next, Irwin County claims that LaSalle can pass through it to seek damages sustained because of the contract's termination to the extent Irwin County is liable to LaSalle for those damages.  Am. Compl. ¶ 1.  While this may be a correct statement regarding pass-through claims, it does nothing to further LaSalle's standing to bring suit.  As noted above, generally, a party cannot bring a contract claim against the United States unless that claim arises from a contract that places that party in privity of contract with the government. *Metric Constructors, Inc. v. United States*, 314 F.3d 578, 581 (Fed. Cir. 2002).  Although some cases suggest in dicta that a pass-through claim is an exception to the privity rule, such dicta is not a completely accurate statement of the law.  Rather, it is more of a legal shorthand description of a pass-through claim.  That is to say, a pass-through claim is one in which a prime contractor uses its privity with the United States to sponsor a subcontractor's claim for damages the subcontractor

sustained as a result of an alleged breach of contract by the United States.  Such claims are brought by the prime contractor in the prime contractor's name and may only be brought if the prime contractor is liable to the subcontractor for the damages that result from the government's breach.  *J.L. Simmons Co. v. United States*, 158 Ct. Cl. 393, 397 (1962) (stating that a pass-through claim "may be maintained only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future").  Stated differently, a pass-through claim "allows a prime contactor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm."  *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008).  If the prime contractor "proves its liability to the subcontractor for the damages sustained by the latter, then the prime contractor itself can show injury to it from the government's action."  *E.R. Mitchell Const. Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999).  Accordingly, a pass-through claim does nothing to aid LaSalle's standing to bring suit in this Court.

Moreover, even if a pass-through claim could somehow give LaSalle standing to directly be a party to this litigation, Plaintiffs' fail to demonstrate the existence of a pass-through claim.  Plaintiffs' pleading on this topic in their amended complaint says only that Irwin County "asserts . . . pass-through claims on behalf of its subcontractors."  Am. Compl. ¶ 1.  Indeed, their response brief cites this single sentence as the basis for their pleading a pass-through claim.  ECF No. 24 at 14 (citing *id.* ¶ 1).  Their response to the government's motion to dismiss includes, however, a more detailed discussion of the claim.  Plaintiffs cite sections in the Operation Agreement between LaSalle and Irwin County that indicate that Irwin County will owe money to LaSalle if Irwin County obtains a favorable judgment in this case.  ECF No. 24 at 15.  The Operation Agreement contains, for example, a broad "Facility Revenues" clause that defines the revenues as "all gross payments or transfers to . . . [the] County . . . from any sources whatsoever, arising from the operation of the Facility for any period."  *Id.*  The Operation Agreement states additionally that "[t]he payment of money by County under any provisions hereof is contingent upon the receipt of Facility Revenues for Prisoners assigned to the Facility."  *Id.*  As a victory on Irwin County's claims in this Court would, therefore, be included in Facility Revenues, and any money it pays LaSalle for its contractually required services must come from those Facility Revenues, Plaintiffs reason that Irwin County is potentially liable to LaSalle for the alleged costs.  *Id.* at 15–16.

In order to proceed on a pass-through theory, a prime contractor must either be liable to the subcontractor for damages that it has already paid or have an outstanding obligation to the subcontractor that it may be subject to in the future.  *J.L. Simmons*, 158 Ct. Cl. at 397 ("The decided cases make abundantly clear that a suit of this nature may be maintained only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future.  These are the only ways in which the damages of the subcontractor can become, in turn, the damages of the prime contractor, for which recovery may be had against the Government.").  Thus, this rule, referred to as the *Severin* doctrine, precludes a prime contractor from bringing a pass-through suit on behalf of a subcontractor in any case in which the prime contractor is not liable to the subcontractor.  Under the *Severin* doctrine, it is "the burden of the government to prove that the prime contractor is *not* responsible for the costs incurred by the subcontractor that are at issue in the pass-through suit."  *E.R. Mitchell*, 175 F.3d

at 1370.  Although the government bears the burden of proving that Irwin County is not liable to LaSalle, Plaintiffs must, as with any other claim, plausibly allege facts to support the pass-through claim in the first place.

Here, Plaintiffs' amended complaint does not allege facts that suffice to establish a pass-through claim.  In fact, the amended complaint contains only a single textual reference to such a claim: "Irwin County, Georgia asserts claims to recover the damages it sustained as well as pass-through claims on behalf of its subcontractors."  Am. Compl. ¶ 1.  Even though they make other arguments in their response to the government's motion to dismiss, Plaintiffs contend that this lone sentence suffices to establish a pass-through claim.  ECF No. 24 at 14.  The language they use in their response to the government's motion to dismiss is instructive in this regard.  They state that "the Amended Complaint asserts LaSalle's entitlement to assert pass-through claims via Irwin County."  *Id.*  Plaintiffs are correct: the amended complaint does nothing more than assert.  It highlights no facts, no contractual provisions, and no allegations of specific account charges that plausibly suggest liability to LaSalle either for outstanding liability or charges for which Irwin County was liable but paid already.  Although the complaint states generally that the government is responsible for damages to both LaSalle and Irwin County for the contract termination, it does not state (much less plausibly allege) why *Irwin County* is liable to LaSalle for those damages.  Am. Compl. ¶¶ 74–76.  Even assuming clauses in the Operation Agreement they attached to their amended complaint, ECF No. 15-2, established such liability, Plaintiffs did not reference them in the amended complaint.  While a motion to dismiss turns on "the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference," the plaintiff must actually incorporate those documents by reference in its complaint, not just attach them and leave it to the government and the Court to discern their significance.  *Rocky Mountain Helium*, 841 F.3d at 1325 (internal citations omitted).

Plaintiffs emphasize in their response to the government's motion to dismiss that "[t]o obtain dismissal of LaSalle's pass-through claims, the [g]overnment bears the burden of demonstrating that Irwin County is not responsible for the costs incurred by LaSalle."  ECF No. 24 at 17.  To that end, to support their argument, Plaintiffs reference *Harper/Nielsen-Dillingham, Builders*' statement that "because of the emphasis of *Severin* on *potential* liability, the plaintiff does not have the burden of proving that the prime contractor would be adjudged liable to the subcontractor in order to overcome the *Severin* defense."  *Harper/Nielsen-Dillingham, Builders, Inc. v. United States*, 81 Fed. Cl. 667, 675 n.9 (2008).  Plaintiffs' references state the *Severin* doctrine's burden of proof accurately but misleadingly.  That is to say, the government can only meet its burden of establishing that Irwin County is not liable to LaSalle if it knows the basis for potential liability in the first place.  A prime contractor can bring a pass-through claim only if it "proves its liability to the subcontractor for the damages sustained by the [subcontractor]."  *Id.* at 674–675.  As the *Severin* doctrine is a defense to a pass-through claim, the government need only establish its burden of proof under that defense if Irwin County plausibly alleges facts consistent with a pass-through claim.[6]  In this sense, the government's burden of proof is to

---

[6] Plaintiffs claim similarly in their response to the government's motion to dismiss that "[g]enerally speaking, the Government does not dispute the potential viability of LaSalle's pass-through claims.  Instead, the Government complains that LaSalle has not adequately alleged that Irwin County has paid any damages to LaSalle or that it remains liable to LaSalle for LaSalle's damages."  ECF No. 24 at

disprove the prime contractor's claimed liability to its subcontractor.  Because Plaintiffs did nothing more in the amended complaint than assert—in a conclusory manner without any supporting factual allegations—the existence of a pass-through claim, the government does not have a burden to disprove these phantom allegations.  Such a burden would stretch notice pleading requirements beyond any recognition.

What is more, even Plaintiffs' arguments in their responsive brief are insufficient to establish a pass-through claim.  Leaving aside that Plaintiffs had to plausibly allege *in their complaint* that Irwin has either already reimbursed LaSalle or remains contractually liable to LaSalle for damages caused by the government to plead properly a pass-through claim, nowhere in their response to the government's motion to dismiss do Plaintiffs indicate that Irwin County has paid, or will have to pay, LaSalle for any costs alleged in the amended complaint.  *See* ECF No. 24 at 14–17.  Instead, Plaintiffs claim two sources establish potential liability.  They highlight the Operation Agreement's Facility Revenues provision, which includes "all gross payments or transfers to . . . [the] County . . . from any sources whatsoever, arising from the operation of the Facility for any period." *Id.* at 15 (quoting ECF No. 15-2 at 2).  This definition suggests that any damages acquired in this lawsuit will go to this account.  As the Operation Agreement provides that Irwin County must pay LaSalle from this account, Plaintiffs argue that any money won by the county in this suit may eventually be used to pay LaSalle.  *Id.*  Plaintiffs point also to a footnote in a January 2021 Government Accountability Office report to the United States House of Representatives Committee on Homeland Security that states that "ICE's guidance on IGSAs states that IGSA-providers (such as private detention operators) may seek to amortize construction costs through a negotiated bed day rate over the life of the agreement.  In other words, detention operators can reimburse themselves for the cost of renovations or construction needed to meet ICE's facility standards by factoring those costs into the bed rate charged to ICE." ECF No. 24-1 at 191 (citing ICE Office of Acquisition Management, Procurement Guide 18-02, Revision 1, Inter-Governmental Service Agreements, March 22, 2019).

Both sources of authority—even had they been pled rather than airdropped into a response brief—fall short of even plausible allegations of Irwin County's potential liability for reimbursement of any damages that LaSalle suffered because of the contract's termination.  First, ICE's recommendations on IGSA detention operators are, according to the Plaintiffs' own citation, nothing more than guidance.  These recommendations come from a report that states its purpose as "Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts." ECF No. 24-1 at 167.  The guidelines suggest that contractors may "reimburse themselves for the cost of renovations or construction needed to meet ICE's facility standards by factoring those costs into the bed rate charged to ICE." *Id.* at 191.  While this definition may be broad enough to include the various "start up costs," "building depreciation," and other fees alleged in the complaint, Am. Compl. ¶ 74, the Operation Agreement between Irwin County and LaSalle has a clause that states that "[i]t is specifically agreed that except for those funds made available by the Agent to the Operating Account for such purpose, County shall have no liability whatsoever for payment of the Management Fee due and owing to Manager, any Operating Expenses, or any other cost, fee or expense relating to the Facility."

---

14–15.  As Plaintiffs must establish one or the other to allege a pass-through claim adequately, the government does indeed dispute the viability of LaSalle's pass-through claims.

ECF No. 15-2 at 13.  In other words, Irwin County is not liable to LaSalle for any costs unless LaSalle made them available in the Operating Account.  Plaintiffs have given no indication that LaSalle has done so, and neither have they amortized any construction costs as mentioned in the guidance they cite.

Second, even if LaSalle had made costs available in the Operating Account, the Plaintiffs' logic is flawed because they state that "the benefit of the bargain struck in this case encompassed all of the expenses for which LaSalle anticipated would be paid over the five-year term of the contract."[7]  ECF No. 24 at 17.  This argument misconstrues the term of the contract between the government and Irwin County; the term was "for a period not to exceed 60 months," not a guaranteed five years.  ECF No. 15-1 at 28.  It was, therefore, not within the expected benefit of the bargain that Irwin County would pay LaSalle's contract-related expenses for five years, because DHS had the option to terminate the contract without cause at any time if it gave 120 days' notice.  Irwin County cannot be potentially liable to LaSalle for some unpaid balance of the remainder of the five years of unspecified costs because the government's contract termination prevented those costs from accruing.

Most importantly, however, nothing in the Operation Agreement, alleged damages in the complaint, or assertions made in the Plaintiffs' response brief suggest that Irwin County itself is liable to LaSalle for any costs related to the contract's termination that have either been paid already or will need to be paid potentially at some future date.  As the Federal Circuit stated in *Winter*, the "typical example of a pass-through claim is a claim by a subcontractor, under fixed-price prime and subcontracts, for government-caused delay that resulted in increased indirect overhead costs for the subcontractor."  523 F.3d at 1348.  In such a scenario, there are discernible costs that the subcontractor bears that are traceable to government actions related to its contract with the prime contractor for which that contractor is at least potentially liable to the subcontractor.  Plaintiffs allege only that "[a]s a result of the wrongful termination of the IGSA, the County and its subcontractor, LaSalle, have incurred sum certain damages."  Am. Compl. ¶ 74.  Nowhere in the amended complaint or their response to the motion to dismiss do Plaintiffs even allege which costs are associated with LaSalle, how they are specifically traceable to the government's termination, or why Irwin County bears any responsibility to pay these specific costs.  At best, they state that Irwin County may pay LaSalle for its continued operational responsibilities at Irwin County Detention Center with the damages from this lawsuit.  ECF No. 24 at 16.  This allegation is too broad to support a pass-through claim.

### 2.    Plaintiffs Fail to State a Claim upon Which Relief can be Granted

Plaintiffs' amended complaint pleads only two substantive claims: bad faith and abuse of discretion.  Although Plaintiffs evidently felt that they had a "strong legal argument" that the government's without cause termination of the contract breached the contract's terms at the time of their request for the contracting officer's final decision on their claims, they must have changed their minds before they came to this Court because no such claim appears in their complaint.  *See* ECF No. 15-4 at 2 (request for contracting officer's final decision).  Despite this

---

[7] The contract mentioned here could not refer to the Operation Agreement between LaSalle and Irwin County, as this contract has an unlimited term absent termination with notice by either party.  ECF No. 15-2 at 17.

claim appearing nowhere in Plaintiffs' complaint, *see generally* Am. Compl., the parties spend significant briefing on whether the contract permitted termination without cause. This is a curious argument in any event, as the contract clearly provides that

> [t]his Agreement . . . will remain in effect for a period not to exceed 60 months unless extended by bi-lateral modification or terminated in writing by either party. Either party must provide written notice of intention to terminate the agreement, 120 days in advance of the effective date of formal termination, or the Parties may agree to a shorter period under the procedures prescribed in Article 11. If this Agreement is terminated by either party under this Article, ICE will be under no financial obligation for any costs after the date of termination.

ECF No. 15-1 at 28. Read either by itself or as part of the contract as a whole, this clause obviously provides for termination without cause on 120 days' notice to the other party.

While it is true that other clauses of the contract provide DHS with the ability to terminate the contract for cause, those clauses do not alter the plain meaning of this without cause termination clause. *See* ECF No. 15-1 at 55, 68. Plaintiffs' reading of those clauses as meaning the contract may only be terminated for cause is unreasonable. The clause is bi-lateral, both Irwin and DHS may invoke it, whereas only DHS can invoke the other clauses cited by Plaintiffs. Reading those clauses to essentially eliminate the without cause termination clause would make no sense, as such a reading would, *inter alia*, mean that Irwin County could not terminate the contract *at all*. Interpreting this section as a bilateral, on-notice termination clause is the most sensible reading of its text, especially given that the contract's period of performance was not fixed. *Id.* at 28 (stating that the term was "a period *not to exceed* 60 months.") (emphasis added). Regardless, this argument over whether the contract can be terminated on notice or only be terminated for cause is unnecessary because Plaintiffs did not plead in their complaint that DHS breached the contract by terminating it without cause. Accordingly, the Court confines its analysis to the two counts Plaintiffs actually pled: bad faith and abuse of discretion.

### a. Plaintiffs' Alleged Facts are Inconsistent with Bad Faith in the Termination of the Contract

Plaintiffs maintain adamantly that the DHS's decision to terminate the contract bears the distinct markings of bad faith and that the public-facing reasons DHS gave in terminating the contract—general health and safety concerns—are mere pretext to conceal it. Am. Compl. ¶¶ 56–58. They cite as evidence of "malice toward the County": the fact that DHS subsequently "obtain[ed] the same services from another source," *id.* ¶ 56; DHS's "unnecessary public defamation of the County" in its press release announcing the contract's termination, *id.* ¶ 57; and that "[t]he findings by the OIG [establish] that the ICDC met the Department's health and safety standards," *id.* ¶ 58.[8] Plaintiffs propose that DHS terminated the contract to "scapegoat

---

[8] The amended complaint gives a convenient list of non-exclusive facts to support the bad faith allegations:

Plaintiffs publicly for conduct that was not even within Plaintiffs' control" and avoid the bad publicity from the allegations of forced hysterectomies from the detention center's off-site doctor. ECF No. 24 at 35. They place particular emphasis on the notion that DHS terminated the contract ostensibly for health and safety concerns even though the investigations into those health and safety concerns had not yet concluded at the time of termination. *Id.* at 34–35. Although they admit their direct evidence of bad faith is somewhat lacking, they suggest that discovery would allow them to probe more deeply into the decision to terminate the contract. *Id.* at 38–39. The thrust of their argument, therefore, is that DHS terminated the contract not because of general health and safety concerns, but rather because of the allegations of forced hysterectomies that DHS knew were false.

It is an established principle that the government is not permitted to terminate a contract in bad faith, even if the contract gives it the ability to terminate with impunity. *See T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999) ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."). Bad faith is not a legal concept that accommodates easy definition. It describes any conduct that evinces a "specific intent to injure" and "animus" toward the opposing party in terminating the contract. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 199 (1976)). The two prototypical examples of bad faith conduct are when the government terminates a contract "simply to acquire a better bargain from another source" and when "the Government enters a contract with no intention of fulfilling its promises." *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996); *see also NCLN20, Inc. v. United States*, 99 Fed. Cl. 734, 759 (2011), *aff'd*, 495 F. App'x 94 (Fed. Cir. 2012) (listing the same two types of conduct as bad faith). A decision by our predecessor court stated that proving bad faith is "tantamount to a showing of malice or conspiracy." *Kalvar*, 211 Ct. Cl. at 199. Consistent with the general presumption that the government "acts in good faith when contracting," in order to demonstrate bad faith Plaintiffs must ultimately present "'well-nigh irrefragable proof' that the government had a specific intent to injure . . . ." *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quoting *Torncello v. United States*, 231 Ct. Cl. 20, 45 (1982)).

Plaintiffs' complaint lacks allegations with plausible factual support sufficient to plead either of the prototypical courses of conduct that evidence bad faith. Plaintiffs allege that DHS "conspired to get rid of the County as a contractor knowing full well that it would obtain the

---

     a. The unnecessary public defamation of the County and LaSalle;

     b. The specific intent to injure the County and LaSalle;

     c. The Secretary's public statements and order to terminate the IGSA without any basis in investigative findings;

     d. The lack of factual support for the basis for termination;

     e. The reliance upon outrageous and false Allegations of forced hysterectomies by an activist group;

     f. The findings by the OIG that the ICDC met the Department's health and safety standards; and,

     g. The benefits received by private contractors who received the ICDC's detainees.

Am. Compl. ¶ 58.

same services from another source" and that the government did so "ultimately for the benefit of the private contractors who received its detainees." Am. Compl. ¶¶ 56–57. In neither the complaint nor the response to the government's motion to dismiss, however, do they allege any facts to support these bare allegations. *See id.* ¶¶ 56–58; ECF No. 24 at 35–36. In their response to the government's motion to dismiss, for example, they state that "[a]fter it abandoned Plaintiffs, ICE then transferred its detention services to other facilities where ICE's benefit of the bargain was now 'better.' Taking advantage of a competitor's benefit where the contractor remains ready and willing to perform in accordance with the agreement constitutes bad faith." ECF No. 24 at 35–36. Plaintiffs do not allege how DHS's bargain at these new facilities was "better," nor do they cite to any documents or other evidence that support their characterization of the DHS's termination actions. That DHS shifted the detainees to another prison after contract termination is not evidence of bad faith by itself. *Kalvar Corp.*, 211 Ct. Cl. at 199 ("The mere fact that a contracting officer awards a contract to another company after terminating the plaintiff's contract is insufficient to show bad faith.").

Plaintiffs sail instead the murkier waters of the "specific intent to injure" standard to suggest DHS's bad faith. Their argument here is a combination of pretext and evidenced malice. Plaintiffs contend that "[t]he unnecessary public defamation of the County and LaSalle," "[t]he lack of factual support for the basis for termination," "[t]he findings by the OIG that the ICDC met the Department's health and safety standards," and "[t]he reliance upon outrageous and false Allegations of forced hysterectomies by an activist group" all indicate the required specific intent to injure Irwin County and LaSalle. Am. Compl. ¶ 58. In other words, according to Plaintiffs, although DHS claimed it terminated the agreement because of health and safety concerns, it actually did so because of the allegations of forced hysterectomies it knew were false. Plaintiffs argue this was the case because DHS's stated health and safety concerns lack a factual basis and unnecessarily compared Irwin County Detention Center to another detention center that had a well-established record of health and safety concerns. The Court recognizes that these arguments are cumulative and that Plaintiffs intend them to be indicia of the government's overall bad faith in choosing to terminate the contract. *See id.* (listing the factual allegations of bad faith). Even taken together, however, Plaintiffs do not allege plausibly that DHS terminated the contract in bad faith because their own evidence (exhibits attached to their complaint) suggests the opposite conclusion.

It is important to note the RCFC 10(c) states that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Thus, as the Supreme Court has held, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily consider when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004 and Supp. 2007). Stated more fully, and as noted by the Federal Circuit,

> the leading commentary has explained: "the contents of any attached writing must be considered by the court in a wide variety of contexts—for example, in determining the sufficiency of the statement of a claim for relief or a defense on a motion to dismiss under Rule 12(b)(6)"; the court "obviously is not bound to accept

the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the attached material"; and "[i]t appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit."

*Rocky Mountain Helium*, 841 F.3d at 1325–26 (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (3d ed. 2004 & Supp. 2016)).

The documents attached to the amended complaint are not plausibly susceptible to Plaintiffs' reading that Secretary Mayorkas defamed Irwin County. Plaintiffs reason that Secretary Mayorkas must have intended to injure Irwin County specifically because he "equated ICDC with another detention facility . . . about which he stated, 'there is ample evidence that the [Massachusetts] Detention Center's treatment of detained individuals and the conditions of detention are unacceptable'" in the internal DHS memo ordering the termination of detention contracts with both. ECF No. 24 at 34 (quoting ECF No. 15-8 at 3). By contrast, the memo addresses Irwin County Detention Center only to state that DHS should "prepare to discontinue [its] use . . . as soon as possible and consistent with any legal obligations." ECF No. 15-8 at 3. It does not compare the conditions in the two prisons, and certainly does not "equate" the two as Plaintiffs suggest. The memo and the accompanying press release mention only a general decision based on holding all detention facilities to "health and safety standards," ECF No. 15-9 at 2, as well as warning that DHS would not "not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention," ECF No. 15-8 at 2. A reasonable reader would not necessarily believe that Secretary Mayorkas compared the two facilities, only that both failed to meet relevant health and safety standards.[9]

Plaintiffs' evidence used to support their characterization of Secretary Mayorkas's statements as defamatory also does not support their allegations of bad faith. Perhaps because the memo and press release were not actually defamatory to Irwin County, Plaintiffs support their characterization with, among other things, a January 2022 DHS OIG report that found that Irwin County Detention Center "adhered to ICE 2011 [Performance-Based National Detention Standards], which specify that detainees have access to appropriate and necessary medical, dental, and mental health care." Am Compl. ¶ 43 (quoting ECF No. 15-11 at 11). As the government points out, this report post-dates Secretary Mayorkas's termination decision. ECF No. 21 at 33. It is questionable support, therefore, for Plaintiffs' argument that there was a "lack of factual support for the basis for termination." Am. Compl. ¶ 58.

Even were it relevant, the OIG report supports the opposite conclusion. While the OIG report did indeed find that Irwin County Detention Center adhered to most health and safety standards, it also "found the facility's chronic care, continuity of care, and medical policies and

---

[9] As the Plaintiffs themselves allege in their complaint, the government stated publicly on multiple occasions that it believed the allegations of forced hysterectomies were false. Am Compl. ¶¶ 23, 25, 26, 40, 41. These statements are inconsistent with an intent to defame the Plaintiffs and undermine further their reading of the memo and press release.

procedures to be inadequate" with "additional concerns in seven other areas: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health." ECF No. 15-11 at 4. The report additionally determined that, although "the facility generally complied with CDC and ICE COVID-19 guidance, [] ICDC and ICE management did not adequately or consistently keep facility employees, ICE staff, and detainees informed of COVID-19 protocols and guidance." *Id.* at 10–11. Plaintiffs assert that this report "demonstrates the Secretary's pretense for closing the ICDC to be false," and exonerates them from the allegations of forced hysterectomies. Am. Compl. ¶ 42. The report, however, states exactly the opposite: "[t]his inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations." ECF No. 15-11 at 4. The OIG report expresses its findings and recommendations more clearly in its title, "Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center." *Id.* at 2. In short, the OIG report Plaintiffs cite to claim pretextual termination actually supports Secretary Mayorkas's determination that the Irwin County Detention Center failed to meet health and safety standards.

Additionally, the other evidence that Plaintiffs cite also does not support their conclusion that the termination was pretextual. They state, for example, that "[t]he Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations 'did not substantiate the allegations of mass hysterectomies on . . . detainees.'" Am. Compl. ¶ 49 (quoting STAFF OF PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION 3 (Nov. 15, 2022)). As with their citations to the January 2022 OIG report, this statement is misleading. While Plaintiffs quote the report accurately, they distort its overall findings. The report concluded that "ICE failed to recognize or adequately explain the vast discrepancy of medical procedures . . . performed on [Irwin County Detention Center] female detainees compared to other providers treating ICE detainees," and noted that "deficiencies in detainee medical care that were identified by multiple DHS oversight components went unaddressed." STAFF OF PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION 103 (Nov. 15, 2022). Again, the Plaintiffs' own evidence undermines rather than plausibly supports their allegations.

Moreover, nothing in their complaint or the attached exhibits plausibly supports Plaintiffs' allegation that DHS "reli[ed] upon outrageous and false Allegations of forced hysterectomies by an activist group" when it terminated the contract with Irwin County. Am. Compl. ¶ 58. First, the government admits that the allegations of forced hysterectomies were false. ECF No. 21 at 8 n. 5. Second, neither the press release nor the memo in which Secretary Mayorkas explained his reasons for terminating the contract mention hysterectomies or anything that is a clear reference to them. *See* ECF Nos. 15-8, 15-9. DHS instead cites generically to concerns with "health and safety standards," ECF No. 15-9 at 2 and "the mistreatment of individuals in civil immigration detention," ECF No. 15-8 at 2. As explained above, Secretary Mayorkas did not even comment on the conditions in Irwin County as he did with the Massachusetts Detention Center. Finally, other complaint exhibi3s indicate that the allegation of forced hysterectomies was not likely decisive in any decision Secretary Mayorkas made because of the volume of other complaints about the facility. One of Plaintiffs' exhibits states that the DHS received 795 complaints about the Irwin County Detention Center between 2017 and 2020.

ECF No. 15-11 at 7 n. 2.  The outsized number of complaints casts doubt upon Plaintiffs' allegation that Secretary Mayorkas relied disproportionately on one admittedly false report of forced hysterectomies when he terminated the contract.

Plaintiffs hope that discovery will reveal the evidence they need to support their claim that DHS terminated its contract with them in bad faith.  ECF No. 24 at 38–39.  Before proceeding to discovery, however, they must plead a plausible claim for relief.  They have failed to do so.  Neither the press release nor the memo announcing the government's termination of its contract, which were both attached to the amended complaint, suggests public defamation against Irwin County, and instead speak only generically of health and safety concerns divorced from the allegations of forced hysterectomies.  Furthermore, the investigative reports that Plaintiffs attached to their own amended complaint as exhibits indicate that DHS's concerns were legitimate.  Plaintiffs have alleged no facts that suggest that DHS's stated reason for terminating its contract with them was pretextual, and the evidence they do submit supports the opposite conclusion.  Discovery would likely be little more than a fishing expedition, which the Court cannot allow.

### b.  Plaintiffs' Abuse of Discretion Argument is Both Implausible and Constitutionally Dubious

Plaintiffs allege also that the contracting officer's contract termination was an abuse of discretion.  Their briefing on this topic illustrates the overlap between their abuse of discretion claim and their bad faith claim.[10]  The non-exhaustive list of alleged facts that support their abuse of discretion claim share half of the facts with the non-exhaustive list of alleged facts that support the bad faith claim.[11]  *Compare* Am. Compl. ¶ 58 (citing "[t]he reliance upon outrageous and false Allegations of forced hysterectomies by an activist group" and "[t]he lack of factual support for the basis for termination" as evidence of bad faith) *with* ¶ 72 (citing the allegations that "[t]he Secretary based his order to terminate the IGSA on outrageous and false Allegations that detainees at the ICDC received forced hysterectomies" and "[n]o evidence whatsoever existed to support the false Allegations of forced hysterectomies" as evidence of abuse of discretion).  As such, the Court addresses Plaintiffs' only independent abuse of discretion claim: that the contracting officer abused his discretion because the termination decision did not arise from his independent judgment.  Although the government casts doubt upon whether abuse of

---

[10] Plaintiffs weave language that references the duty of good faith and fair dealing into the abuse of discretion count of their complaint.  They state, for example, that "[g]overnment contracts, like private contracts, impose upon each party a duty of good faith and fair dealing in its performance and enforcement," and that the manner in which the government terminated the contract violated it.  Am. Compl. ¶ 62.  The Court interprets this argument, however, as conflating good faith and fair dealing and abuse of discretion rather than as an independent count because the arguments in these sections of their complaint are derivative of the bad faith arguments made earlier in the document and have been pled within the abuse of discretion count.

[11] Their complaint argues similarly that "[t]he County had a reasonable expectation that the IGSA would extend beyond the 11 months it was in effect due to the Government's reference to the agreement remaining in effect for a period not to exceed 60 months" and "it expected that the Government would not act to cancel the IGSA based upon the false Allegations."  Am. Compl. ¶¶ 65, 66.  As the Court rejected these same arguments in this opinion when the Plaintiffs made them to allege bad faith, the Court will not repeat itself.

discretion is even an actionable claim for a contract that is not governed by the Federal Acquisition Regulation, the Court need not answer that question because Plaintiffs fail to state a plausible abuse of discretion claim.[12]   ECF No. 21 at 22.

Much like bad faith, abuse of discretion is not easily defined.  In order to demonstrate that DHS abused its discretion in terminating the contract, Plaintiffs must show that the decision to terminate was arbitrary and capricious.  *U. S. Fid. & Guar. Co. v. United States*, 230 Ct. Cl. 355, 368 (1982) ("[I]n order to be an abuse of discretion, the decision must be found to be arbitrary and capricious.").  Factors useful in determining whether a contracting officer abused his or her discretion include "(1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation."  *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citing *U. S. Fid. & Guar. Co.*, 230 Ct. Cl. at 676); *see also Keeter Trading Co., Inc. v. United States*, 79 Fed. Cl. 243, 252 (2007) (citing the same factors).  Abuse of discretion turns inherently upon the level of decision-making authority that the contract at issue gives to a contracting officer.  In *Securiforce Int'l Am., LLC v. United States*, for example, the Federal Circuit held that a contracting officer did not abuse his discretion when he alienated his responsibility to make factual determinations related to termination because there was no "contractual language that entitled the contractor to the resolution of factual disputes by a particular official."  879 F.3d 1354, 1363–64 (Fed. Cir. 2018); *see also TigerSwan, Inc. v. United States*, 118 Fed. Cl. 447, 453 (2014) ("*In a situation where the contracting officer is given the ultimate discretion to make the decision*, the [contracting officer's] failure to make an independent decision weighs in favor of finding an abuse of discretion." (emphasis added)).

Plaintiffs' emphasis on its improper delegation argument changed between the amended complaint and its response to the government's motion to dismiss.  Although the complaint's allegations control and cannot be amended by a responsive pleading, the Court will nonetheless address each of Plaintiffs' delegation/abuse of discretion arguments.  *See Mendez-Cardenas v. United States*, 88 Fed. Cl. 162, 166 (2009) ("[T]he Response cannot serve to amend plaintiff's Complaint).   The amended complaint contends that the contracting officer abused his discretion because his decision to terminate "was not based on the independent judgment of the contracting officer or other designated decision maker, but rather was delegated to and improperly influenced by others."  Am Compl. ¶ 68.  Plaintiffs allege that DHS's decision to terminate was "based solely [on] the activist group's Allegations that the Department knew were unsupported and/or demonstrably false," *id.*, and the "bad publicity generated by false Allegations" rather than its own independent factfinding efforts to determine their truthfulness, *id.* ¶ 72.  Plaintiffs argue, therefore, that, because DHS "did not investigate any facts or engage in any independent review whatsoever," it failed to make an independent judgment on the issue and constructively delegated its discretion to determine facts related to the termination to the activist groups that alleged the forced hysterectomies.  ECF No. 24 at 37.

---

[12] Intergovernmental detention agreements like the contract between Irwin County and the government at issue here are not subject to the FAR.  *Bd. of Cnty. Comm'rs of the Cnty. of Bernalillo, NM v. United States*, 93 Fed. Cl. 228, 234 (2010).  FAR contracts are subject to certain interpretational principles distinct supplementary to those that apply to standard contracts.

As with their bad faith pretext argument, Plaintiffs' allegations here conflict with the exhibits they attached to their amended complaint. Secretary Mayorkas stated specifically in the memo announcing the contract's termination that he "analyz[ed] the use of detention and the conditions in civil immigration detention facilities[,] . . . read DHS reports, including those of [the] Office for Civil Rights and Civil Liberties, government accountability reports, and numerous additional reports that governmental and non-governmental organizations have issued" to make the decision, and also discussed the termination with the Acting Director of ICE "and other subject-matter experts." ECF No. 15-8 at 2. The accompanying press release cites the same reports and subject matter experts. ECF No. 15-9 at 2–3. Nothing indicates that Secretary Mayorkas relied "solely [on] the activist group's Allegations," and Plaintiffs do not allege any facts that suggest that he did so. Am. Compl. ¶ 68. In fact, portions of the complaint and complaint exhibits they cite suggests the contrary. The amended complaint states that "in September 2020, Deputy Secretary [of Homeland Security] Ken Cuccinelli sent three members from the Department of Homeland Security to ICDC to investigate the Allegations. . . . While no report was generated, Deputy Secretary Cuccinelli openly and publicly discussed the Allegations as being 'flat false,' 'clearly false,' 'should have never been made in the first place,' and 'irresponsible.'" *Id.* ¶ 23. Far from relying exclusively on the activist group's complaints, Plaintiffs' own allegations state that DHS performed its own investigation and found the reports baseless.[13] The Court cannot find Plaintiffs' allegations of an abuse of discretion plausible when their amended complaint itself, and the exhibits attached thereto, contradict the premises that underlie those allegations. *See* 5A WRIGHT & MILLER § 1327 (the Court "obviously is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the attached material").

Even if the complaint exhibits that they cited and their own allegations did not contradict the basis for their abuse of discretion claim, Plaintiffs have still not stated a plausible abuse of discretion claim. Plaintiffs allege that Secretary Mayorkas terminated the contract with Irwin County because he wanted to avoid the "bad publicity generated by [the] false Allegations" and that this decision was impermissible. *Id.* ¶ 72. Such a decision, however, would not be an abuse of discretion. Section 1231(g)(1) orders the Secretary of Homeland Security to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). An accompanying subsection states that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable." 8 U.S.C. § 1231(h). This language suggests that the Secretary's discretion to decide the appropriateness of detention facilities is broad, and that any review of that discretion must be extremely limited. If, as Plaintiffs imply, Secretary Mayorkas terminated the contract with Irwin County because he believed that the bad publicity caused by the activist group's false allegations of hysterectomies made Irwin County Detention Center an inappropriate place to hold prisoners,

---

[13] The amended complaint also alleges that "[t]he ICE Acting Director concurred with ICE Enforcement and Removal Operations and ICE Health Services Corps' recommendation to conduct an annual review of ICDC in which Dr. Stewart Smith reported no violations and that the ICDC was compliance with ICE Performance-Based National Detention Standards." Am. Compl. ¶ 25. This annual review is further evidence that the government exercised independent judgment in its decision to terminate and did not rely on the activist group's complaint to the extent that they delegated their responsibility to make independent factual determinations.

the relevant statute gave him the authority to do so.[14]  And, if the Secretary had this authority, he does not abuse his discretion by exercising it.  Thus, by alleging that the Secretary abused his discretion simply by exercising his statutorily granted authority, Plaintiffs' complaint does not state a plausible abuse of discretion claim.  Plaintiffs needed to allege more than they have.

Moreover, Plaintiffs also needed to defend *these* allegations in their response to the government's motion to dismiss.  *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").  However, rather than respond to the government's motion to dismiss the *above* abuse of discretion allegations for failure to state a claim, in response to the government's motion to dismiss Plaintiffs abruptly change their abuse of discretion argument.  While they maintain that the contracting officer "d[id] not make an independent judgment" when he terminated the contract, Plaintiffs change the actor to whom the contracting officer allegedly delegated his responsibilities improperly.  ECF No. 24 at 36.  They state this time that DHS abused its discretion because it terminated the contract based on "the Secretary's order[] alone, without the independent judgment of the Contracting Officer."  *Id.* at 37.  They cite various decisions by the Federal Circuit and this Court that emphasize that a contracting officer must "put his own mind" to the termination decision, *TigerSwan*, 118 Fed. Cl. at 452, and that the issuance of a termination without making a "judgment as to the merits of the case" is an "abdication of responsibility," *Darwin Constr. Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987) (internal quotations omitted).  They point also to language in the contract that states that "only the Contracting Officer may take formal action . . . for unsatisfactory performance."  ECF No. 24 at 37 (citing Doc. 15-1 at 66–67).  In other words, Plaintiffs assert that contracting officers must always exercise their own discretion even when given a direct order by the Secretary of Homeland Security.[15]

However, the contract does not provide the contracting officer the kind of discretion that Plaintiffs contend that it does.  In support of their argument, they cite to Article 32 of the contract, which covers the Quality Assurance Surveillance Program ("QASP").  ECF No. 15-1 at 66-68.  The QASP requires Irwin County to maintain "[g]ood management and . . . an adequate Quality Control Plan" to "allow the facility to operate within acceptable quality levels."  *Id.* at 68.  Although the contract states that "only the Contracting Officer may take formal action against the Service Provider for unsatisfactory performance" for failure to abide by these

---

[14] The amended complaint, again, supports the notion that the Secretary could reasonably have believed that this was the case.  Plaintiffs attach a news story, ECF No. 15-10, that covers the allegations of forced hysterectomies in some detail, and the news coverage was evidently of sufficient public interest that Deputy Secretary of Homeland Security Ken Cuccinelli felt the need to debunk the story publicly on the radio, Am. Compl. ¶ 23.  The government's report that the DHS OIG received 795 complaints about the facility supports the notion that a reasonable decisionmaker could have decided that the publicity around the facility hurt its ability to detain prisoners effectively.  ECF No. 21 at 7 (citing ECF No. 15-11 at 7).

[15] The Plaintiffs may reference this argument also in the complaint when they state that "[t]he Secretary's decision to terminate the IGSA was not part of a broader change to federal immigration policy."  Am. Compl. ¶ 72.  Plaintiffs may be arguing that the contracting officer can simply obey a direct order without exercising their own independent judgment when the Secretary does so pursuant to a broader change in immigration policy.  It is unclear why this fact would make a difference, but even if it did this argument is too shapeless to address in any detail.

demands, this guarantee is wholly divorced from the power to terminate the contract in its entirety. *Id.* at 67. Article 32 mentions only monetary penalties for failure to abide by its terms. *Id.* ("The Government may reduce the invoice or otherwise withhold payment for any individual item of nonconformance observed"). It states explicitly that "[t]he rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this Agreement" and that Irwin County "may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance." *Id.* at 68. In other words, Article 32 is a separate sanctioning mechanism under which only the contracting officer may take formal action in assessing its particular monetary penalties. Termination, contained in another section of the contract altogether, is not purely within the contracting officer's discretion.

Plaintiffs also misread the case law they cite to support their argument. The cases that Plaintiffs offer emphasize the contracting officer's "responsibl[ity] for making an independent decision with regard to a contract." *TigerSwan*, 118 Fed. Cl. at 452; *see also Securiforce Int'l Am., LLC v. United States*, 125 Fed. Cl. 749, 786 (2016); *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 209 (2007). The Federal Circuit recently clarified the meaning of this and similar statements, and overturned a decision by another judge of this Court that found a contracting officer's contract termination to be an abuse of discretion because he failed to make a decision independently. The circuit explained that the law demanded such independent judgment *only* if "contractual language . . . entitled the contractor to the resolution of factual disputes by a particular official." *Securiforce*, 879 F.3d at 1363–64. The contract at issue here does not specify that only the contracting officer can terminate. *See* ECF No. 15-1 at 19–20.

Furthermore, even if the contract specified that only the contracting officer could terminate, the Court does not interpret the case law to suggest that such contract language removes the Secretary of Homeland Security's ability to make individual policy decisions regarding DHS contracts based on his own analysis of the facts. The two decisions cited in *Securiforce*, for example, involved situations in which the contracting officers delegated their decisions to either another official similarly ranked or a private party. *See N.Y. Shipbuilding Corp. v. United States*, 180 Ct. Cl. 446, 455–58 (1967) (delegating to an official besides the contractually-mandated "Nuclear Projects Officer of the Maritime Administration"); *Pac. Architects & Eng'rs Inc. v. United States*, 203 Ct. Cl. 499, 516–517 (1974) (*per curiam*) (delegating to contracting officer's legal counsel). The Secretary of Homeland Security is a cabinet officer, appointed directly by the President, with an entirely distinct statutory discretion to arrange detention facilities. *See* 8 U.S.C. § 1231(g)(1). Contracting officers, who are always beholden to the Secretary's oversight, do not become exempt from such oversight merely because a contractual provision so states.

The scope of Plaintiffs' argument has questionable constitutional implications. Plaintiffs argue that "the Government cites no authority whatsoever to sustain its arguments that the Secretary's order, alone, without the independent judgment of the Contracting Officer, could terminate the contract." ECF No. 24 at 37. A *but see* citation to Article II of the Constitution should have followed this sentence. The Supreme Court has emphasized repeatedly that the President can only "execute the laws. . . . by the assistance of subordinates" as Article II requires if they "act for him under his direction." *Myers v. United States*, 272 U.S. 52, 117 (1926). This

principle applies to the Secretary of Homeland Security and those under his authority; indeed, Secretary Mayorkas's powers as a principal officer of the United States are some of the most important to carry out Article II's mandate that the laws be enforced faithfully. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (noting that "[o]nly the President, with the advice and consent of the Senate, can appoint noninferior officers"). Plaintiffs' proposition that the parties to a contract could insulate a contracting officer from orders by a principal officer of the United States (and thus the President) by merely including in a contract a clause that designated the contracting officer as the *only* official responsible for termination finds no support in the law. *See Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) ("[T]he Framers sought to ensure that those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." (internal citations omitted)); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020) (disparaging "vesting significant governmental power in the hands of a single individual accountable to no one"). In other words, when the Framers vested the "executive Power" in the President, they vested "all of it" in the President, not all of it save for those powers that the parties to a government contract might one day want to contractually reserve (in a manner unreviewable by superior officers) to a contracting officer. *See Seila L. LLC*, 140 S. Ct. at 2191. Rather, the Constitution demands that contracting officers be accountable to, and directed by, the appropriate superior officer who in turn is supervised by the President, for "[w]ithout such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enterprise Fund*, 561 U.S. at 514. If this were not the case, and Plaintiffs' argument were correct, it would run afoul of this constitutional principle or, at the very least, cause the contracting officer to exercise the authority of a superior officer without the appropriate appointment to that position. *See Arthrex*, 594 U.S. at 12 (stating "[t]hat [the Executive] power acquires its legitimacy and accountability to the public through a clear and effective chain of command down from the President, on whom all the people vote" (internal quotations omitted)). For these reasons (and the fact that it was unpled), this variation of Plaintiffs' abuse of discretion claim must fail.

Plaintiffs fail to state a plausible abuse of discretion claim. They have not alleged any facts that indicate that DHS failed to exercise independent judgment by relying exclusively on the activist group's allegations of false hysterectomies when it terminated the contract with Irwin County. Their own complaint exhibits suggest the contrary. Even if they did not, the Secretary had the discretion to decide whether the bad publicity resulting from the activists' allegations made Irwin County Detention Center an appropriate place to hold detainees. Moreover, they abandoned this claim by not addressing it in response to the government's motion to dismiss. Furthermore, their alternative argument that the contracting officer assigned to the Irwin County Detention Center contract had to exercise his own independent judgment apart from the Secretary's order to terminate is based on a constitutionally dubious misreading of the clear text of the contract and the applicable case law.

## CONCLUSION

For the foregoing reasons, the Court finds that LaSalle was neither in privity of contract with the United States nor an intended third-party beneficiary of Irwin's contract with the United

States and, therefore, lacks standing to pursue a breach of contract claim.  Moreover, its pass-through argument does nothing to enhance its standing.  The Court further finds that Plaintiffs have failed to allege plausibly either a bad faith or abuse of discretion claim.  Therefore, the Court **GRANTS** the government's motion to dismiss under RCFC 12(b)(1) and (6).  The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge
